# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40267**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Justin D. ZIMMERMANN**
Cadet, U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 October 2023

———————————

*Military Judge*: Charles G. Warren (arraignment and motion hearings); Mark F. Rosenow.

*Sentence*: Sentence adjudged 18 December 2021 by GCM convened at United States Air Force Academy, Colorado. Sentence entered by military judge on 13 February 2022: Dismissal, confinement for 6 years, and forfeiture of all pay and allowances.

*For Appellant:* Major Matthew L. Blyth, USAF; Major David L. Bosner, USAF.

*For Appellee:* Major Morgan R. Christie, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, CADOTTE, and MASON, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge CADOTTE and Judge MASON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer members found Appellant guilty, contrary to his pleas, of one specification of willful dereliction of duty, one specification of sexual assault, and one specification of sexual abuse of a child, in violation of Articles 92, 120, and 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 920b.[1,2] The court members sentenced Appellant to a dismissal, confinement for six years, and forfeiture of all pay and allowances. The convening authority took no action on the findings or sentence.

Appellant raises the following issues on appeal: (1) whether Appellant's conviction for sexual abuse of a child is legally and factually sufficient;[3] (2) whether Appellant's conviction for sexual assault is legally and factually sufficient;[4] (3) whether Appellant received ineffective assistance of counsel; (4) whether the military judge abused his discretion by admitting graphic photographs from SP's sexual assault forensic examination; (5) whether the military judge abused his discretion when he admitted propensity evidence under Military Rules of Evidence (Mil. R. Evid.) 404(b) and 413; (6) whether the military judge abused his discretion in admitting certain sentencing evidence; (7) whether trial counsel committed prosecutorial misconduct during his argument on sentencing; (8) whether Appellant's sentence is inappropriately severe; and (9) whether Appellant was denied a constitutional right to a unanimous verdict. We have carefully considered issue (9) and find it does not require discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).[5] As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

---

[1] References to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The court members found Appellant not guilty of three specifications of sexual assault and one specification of sexual abuse of a child in violation of Articles 120 and 120b, UCMJ.

[3] Appellant personally raises legal sufficiency pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Appellant personally raises legal sufficiency pursuant to *Grostefon*, 12 M.J. 431.

[5] *See United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023).

## I. BACKGROUND

Appellant joined the Air Force as an enlisted member in September 2014. He was subsequently selected to attend the United States Air Force Academy (USAFA) in Colorado Springs, Colorado. Appellant's first semester as a USAFA cadet was in the fall of 2016.

In September 2018, when Appellant was a 22-year-old second-year cadet, he met SP, SP's mother PT, and SP's stepfather JT. Appellant and SP's family were attending the same church in Colorado Springs when they were introduced by a mutual friend. Appellant, SP, and SP's mother and stepfather were part of a group that went to brunch together after the church service. PT was impressed by Appellant, and thereafter Appellant began spending time with the family, occasionally eating meals with them, doing his laundry at their house, and attending church together, among other activities. JT became a sort of mentor to Appellant, playing tennis together and discussing life and spiritual matters. SP, who was 17 years old when she met Appellant, was on friendly terms with him.

SP was a competitive figure skater, and she was friends or acquaintances with several other female competitive figure skaters who lived or trained in Colorado Springs. One of these friends was NA, who met Appellant through SP's family but did not know him well. NA was 15 years old at the time. NA lived with her mother in Colorado Springs, but beginning in late December 2018 NA stayed with SP's family for several weeks while NA's mother was on a trip outside the United States.

On the night of 21 January 2019, SP, PT, JT, NA, and Appellant had a bible study and dinner together at SP's home. After dinner, Appellant spent some time conversing with SP and NA, who was still 15 years old. NA later testified Appellant talked "about how many people [he] had slept with," and complimented SP and NA on their bodies and appearances. Eventually NA prepared for bed and took a shower. When NA later went to the kitchen for a glass of water, she saw Appellant lying on the rug in the living room. NA asked Appellant what he was doing there, and Appellant explained he was staying overnight due to bad weather. NA walked toward the window to look outside at the weather. According to NA, Appellant then walked up behind NA, put his arm around her, turned her to face him, and grabbed and squeezed her "butt." NA testified Appellant then grabbed her hair, kissed her on her mouth "[w]ith his tongue," and bit her lip and her ear. Appellant told NA he wished she was older and not to tell anyone, especially SP. NA then walked away and returned to her bedroom downstairs. Appellant sent NA a Snapchat message asking her to

3

return upstairs to "cuddle" because he thought SP's parents were asleep, but NA refused.

SP testified that at approximately 0400 the following morning, she was sleeping in her bed when she was awakened by a Snapchat message from Appellant asking if he could come say goodbye to her. SP responded "no." However, before SP fully returned to sleep, Appellant entered her room, approached her bed, and tried to give her a hug. This made SP feel "frustrated." Appellant lifted SP's torso up and attempted to kiss her, but SP turned her head away. Appellant left and SP went back to sleep.

Later that morning, SP and NA went to the skating rink together. On the way to the rink NA told SP that Appellant had kissed her, and SP told NA that Appellant had tried to kiss her. NA also told several other friends Appellant had kissed her, but at that time neither NA nor SP reported these incidents to SP's parents, law enforcement, or Air Force authorities.

PR, the friend who had initially introduced Appellant to SP's family, learned that Appellant had kissed NA within a "day or so" after it happened. PR decided to talk with Appellant in person "to hear his side of what happened." When they met, PR told Appellant "he should be careful with these people" and should "hang out with people that were closer to his age." PR left the conversation with the impression Appellant would not "go around" SP's family anymore. According to PR's testimony, she did not specifically inform Appellant NA was only 15 years old, and Appellant did not indicate any particular belief or mistake regarding NA's age.

In November 2019, PT and JT went out of town for approximately a week, leaving the then-18-year-old SP at home. During that week SP invited three male friends to the house and they drank alcohol together. At one point, one of SP's guests accidentally damaged a door. SP was afraid she would get in trouble with her mother for having boys and alcohol at the house when her parents discovered the damage. SP decided to ask Appellant if he would take the blame for breaking the door, because SP's parents thought highly of Appellant and he was "the one person on this planet that [PT] would allow to be home when [PT] is not, and who [PT] trusts the most." SP contacted Appellant, who agreed to cooperate with SP's plan.

Two days later, while PT and JT were still out of town, SP drove to meet Appellant outside the USAFA gate. SP let Appellant drive her car back to her house. On the way, Appellant told SP he really wanted beer and stopped at a liquor store. Appellant asked if SP wanted anything, and SP responded,

"surprise me." Appellant bought a 12-pack of cans of flavored hard seltzer,[6] and they continued to SP's house.

After they arrived, SP and Appellant each prepared something to eat and began drinking the cans of hard seltzer. SP drank approximately one-and-a-half cans with her food; Appellant drank more. After they ate and talked, they decided to play pool. Appellant brought the remaining cans of hard seltzer to the pool table. Appellant encouraged SP to continue drinking, telling her, "You need to finish your [alcohol] like a woman." Although SP thought Appellant's statement was "unnecessary" and she "didn't need to prove [her] drinking abilities to anyone," she ended up drinking a total of 5 of the 12 cans; Appellant drank the rest. After two games of pool, SP told Appellant to call someone to give him a ride back to USAFA because neither SP nor Appellant could drive. SP then began to clean her room and prepare to go to bed. As SP cleaned her room, she asked Appellant if he had found someone to give him a ride, and Appellant responded "yes."

As SP was walking past Appellant, he grabbed her by her lower back, pulled her toward him, and tried to kiss her. SP leaned away from him and told Appellant, "No, Justin, we're not doing this." Later, SP and Appellant were in the living room when Appellant tried again to kiss SP. SP told him "no" again, but he successfully kissed her on the lips. Feeling "confused," SP went into the kitchen. Appellant followed her, grabbed her by the waist, and again tried to kiss her; SP again told him "no" and leaned away. According to SP, they "ended up back on the couch," although she could not remember how they got there. Appellant pulled SP on top of him so she was straddling him. Appellant then lifted SP by her thighs and carried her a short distance to her bedroom. Appellant put SP down on the bed on her back, with her legs dangling off the side. SP again told Appellant, "No, Justin, we're not doing this." Appellant then removed her clothing and his clothing. SP testified she felt "so frozen and stuck, like cement." According to SP, Appellant kissed her neck, digitally penetrated her vagina, and put his mouth on her vagina. Appellant then penetrated her vagina with his penis until he ejaculated.

When Appellant got off her, SP rose and said, "What the f[**]k? I never wanted to have sex with you and I'm not on birth control." SP put on a bathrobe and, "swearing a lot," went into her bathroom for approximately ten minutes. When she came out, Appellant was putting on his shoes by the front door. Appellant made a comment about SP not being on birth control. SP told Appellant to leave, and he did. SP then returned to her bathroom and cried very hard,

---

[6] Evidence introduced at trial indicated the hard seltzer contained five percent alcohol.

"wailing" so much she was "shaking" and "could barely breathe." SP attempted to call her cousin LK, who did not answer. She then called a friend, SS, and told her she thought she had been "raped." SS advised SP to go to the hospital. Because SS was out of town, SP called another friend, TM, who happened to be with NA at the time. TM picked up SP and drove her to a hospital in Colorado Springs, accompanied by NA.

In the meantime, then-Cadet NL, the friend Appellant had contacted for a ride back to USAFA, was driving to SP's house when he found Appellant walking on a sidewalk next to the road. Cadet NL picked Appellant up and drove him back to USAFA. During the trip, Cadet NL thought Appellant seemed "unnerved," alternately leaning forward with his palms pressed into his eyes or leaning back with his arms crossed. Appellant was uncharacteristically quiet and fell asleep during the ride. After Cadet NL parked the car and nudged Appellant to wake him, Appellant asked Cadet NL to leave the keys and indicated he intended to sleep in the car.

At the hospital, SP underwent a forensic sexual assault examination. The sexual assault nurse examiner (SANE) found two bruises on the inside of SP's right thigh, but did not note any injuries in SP's genital area. The SANE noted a significant amount of fluid in SP's vaginal cavity, consistent in appearance with seminal fluid. Subsequent testing of samples by the United States Army Criminal Investigation Laboratory revealed the presence of DNA matching Appellant.

SP initially made a restricted civilian sexual assault report at the hospital. However, two days later she reported the sexual assault to her mother, and the day after that she reported it to Air Force authorities at USAFA. SP was subsequently interviewed by the Air Force Office of Special Investigations (AFOSI). After SP made her report, NA was also interviewed by AFOSI agents and reported being kissed by Appellant in January 2019. NA did not mention in her initial AFOSI interview that Appellant had also grabbed her buttocks, but she later informed the agents of this when she returned to the AFOSI to have her phone examined.

Appellant was charged with two specifications related to NA: that he committed a lewd act on NA by engaging in indecent conduct by kissing her on the mouth with his lips (Specification 1 of Charge III), and that he committed a lewd act on NA by touching her buttocks with his hand (Specification 2 of Charge III), both in violation of Article 120b, UCMJ. Appellant was convicted of the former and acquitted of the latter. Appellant was charged with three specifications of sexual assault against SP: by penetrating her vulva with his penis without consent (Specification 1 of Charge II), by penetrating her vulva

6

with his finger without consent (Specification 2 of Charge II), and by causing contact between his mouth and tongue and her vulva without consent (Specification 3 of Charge II), all in violation of Article 120, UCMJ. Appellant was also charged with two unrelated specifications of sexual assault against two other alleged victims, in violation of Article 120, UCMJ (Specifications 4 and 5 of Charge II). The court members found Appellant guilty of Specification 1 of Charge II, and not guilty of Specifications 2, 3, and 4 of Charge II; Specification 5 was withdrawn and dismissed before trial. Appellant was also charged with and convicted of one specification of willful dereliction of duty in violation of Article 92, UCMJ, for providing alcohol to SP, who was under 21 years old.

## II. DISCUSSION

### A. Legal and Factual Sufficiency of Sexual Abuse of a Child

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own

independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Article 120b(c), UCMJ, provides: "Any person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct." *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 62.a.(c). A "child" is "any person who has not attained the age of 16 years." *MCM*, pt. IV, ¶ 62.a.(h)(4). The term "lewd act" includes, *inter alia*, "any indecent conduct, intentionally done with or in the presence of a child . . . that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." *MCM*, pt. IV, ¶ 62.a.(h)(5)(D). Article 120b, UCMJ, does not require the Government to prove that an accused knew a child had not attained the age of 16 years; however, it is a defense in a prosecution for sexual assault of a child that the accused reasonably believed the victim had attained the age of 16 years, which the accused must prove by a preponderance of the evidence. *See MCM,* pt. IV, ¶ 62.a.(d)(2); *see also* Rule for Courts-Martial (R.C.M.) 916(j)(2). Evidence relating to an accused's belief as to the victim's age may be direct or circumstantial and may arise from matters introduced by the prosecution, the defense, or the court-martial itself. *United States v. Thompson*, 83 M.J. 1, 4 (C.A.A.F. 2022).

### 2. Analysis

The court members convicted Appellant of committing a lewd act on NA, then a child under the age of 16 years, by engaging in indecent conduct, specifically kissing her on the mouth with his lips. The Government introduced ample evidence to prove this offense beyond a reasonable doubt. NA testified that Appellant kissed her on the lips with his mouth. Her testimony that during this incident Appellant also put his tongue in her mouth, grabbed her hair, bit her lip and her ear, told her not to tell anyone, and after she left invited her back to the living room to "cuddle" all indicate this kiss was of a sexual nature the court members could find indecent, rather than some innocent gesture.[7] Appellant suggested at trial and suggests on appeal that NA colluded with SP to fabricate or embellish her allegations, but the Government introduced

---

[7] NA testified Appellant also grabbed her "butt," but the court members found Appellant not guilty of a separate specification alleging he sexually abused NA by touching her buttocks.

evidence NA made several prior consistent statements to SP, other friends, and the AFOSI that Appellant had kissed her. NA's age was not reasonably in dispute as the Government not only elicited NA's testimony but introduced her birth certificate, proving she was 15 years old at the time.

Appellant's primary argument is that a preponderance of the evidence proved Appellant reasonably and actually believed NA was at least 16 years old. Appellant cites several items of circumstantial evidence that he contends support his argument. For example, on cross-examination NA acknowledged that at the time most of her "friend group" was older than NA, and that she did not know Appellant well. During PR's testimony, she agreed NA "held herself out to the public and her friends as being older" than she actually was. The Defense introduced four photos of NA taken later in 2019, two taken at a skating competition and two taken when she was modeling clothes designed by a friend, that the Defense contended demonstrated NA appeared older than her true age. The Defense also cited evidence that Appellant had no further contact with NA after PR warned Appellant to "hang out with people that were closer to his age" after PR learned of the kissing incident. On the other hand, NA testified Appellant made comments to her specifically about the fact that she was only 15 years old, such as "I can't believe you're 15" and "You look older than that." The Government also introduced a photo of NA closer in time to the charged offense, without makeup and dressed in ordinary clothes, that trial counsel contended proved NA looked younger than the photographs the Defense introduced. The Defense presented a similar mistake of fact argument to the court members, who nevertheless found Appellant guilty. We are similarly unpersuaded a preponderance of the evidence demonstrates Appellant had an actual and reasonable belief NA was at least 16 years old.

Drawing every reasonable inference from the evidence in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions for sexual abuse of a child. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Rodela*, 82 M.J. at 525.

**B. Legal and Factual Sufficiency of Sexual Assault**

**1. Law**

The standards of review for legal and factual sufficiency are set forth in subsection II.A.1, *supra*, in relation to issue (1).

In order to convict Appellant of sexual assault as alleged in Specification 1 of Charge II, the Government was required to prove Appellant penetrated SP's

vulva with his penis without her consent. *MCM*, pt. IV, ¶ 60.a.(b)(2)(A). "'[C]on-sent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A).

**2. Analysis**

The Government introduced sufficient evidence for the court members to find Appellant committed sexual assault against SP beyond a reasonable doubt. SP testified Appellant penetrated her vagina with his penis without her consent. As of November 2019, SP and Appellant were friends but had no sexual or romantic relationship. She testified that on the night in question she repeatedly told Appellant they were "not doing this" in response to his attempts to kiss her and other sexual advances. SP reported the sexual assault to multiple friends on the same night it occurred and agreed to go to a hospital for an examination. At the hospital, she provided the SANE an account of the sexual assault that was generally consistent with her court-martial testimony. The results of the examination and subsequent DNA analysis corroborated SP's testimony that Appellant's penis penetrated her vagina. Cadet DL's testimony that he found Appellant walking along the road supported SP's testimony that she had told him to leave the house, and the court members could reasonably find Appellant's unusual and "unnerved" behavior during the car ride back to USAFA suggested consciousness of guilt and awareness that something was wrong.

Appellant does not contest the sexual act occurred, but contends the Government failed to prove SP did not consent or that Appellant did not have a reasonable mistake of fact that SP consented. Appellant cites alleged inconsistencies between SP's testimony and prior statements she had made about the sexual assault. In general, we find these cited inconsistencies to be minor, and the court members could reasonably find them insignificant. SP was not inconsistent regarding her allegation that Appellant penetrated her vagina with his penis without her consent. Moreover, the court members could reasonably find the alleged inconsistencies paled in comparison to such considerations as SP's immediate reporting, emotional reaction, and consistent statement to the SANE, as well as her in-court testimony.

Apart from alleged inconsistencies, Appellant contends certain aspects of SP's testimony are not credible. He cites her testimony on redirect examination that she did not take more active steps to avoid Appellant after he began attempting to kiss her because leaving him in the living room and going to bed would not be the "polite" thing to do. However, SP further explained that she

"was trying to de-escalate the situation without making a super big deal about it, doing it calmly and effectively," aware that Appellant was "much bigger and much stronger" than she was. The court members could reasonably conclude SP's attempt to manage the situation rather than flee or physically resist was a believable response to the situation. Similarly, Appellant suggests it is not credible that Appellant would have been able to remove SP's clothing and his own if she did not consent. However, the court members could reasonably find SP feeling "frozen" and unable to move when Appellant put her on the bed was a credible reaction to the situation that allowed Appellant to remove his clothing and her clothing without her consent. Nor would this "frozen" reaction cause Appellant to reasonably but mistakenly believe SP was consenting, when she had previously repeatedly told him "no" and where lack of physical resistance does not constitute consent. *See MCM*, pt. IV, ¶ 60.a.(g)(7)(A).

Accordingly, we find Appellant's conviction for sexual assault of SP legally sufficient. In addition, having weighed the evidence in the record of trial and having made allowances that we did not personally observe the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## C. Ineffective Assistance of Counsel[8]

### 1. Additional Background

During her AFOSI interview, SP told the agents that approximately seven months before the sexual assault she had gone on one date with Appellant. SP told the agents that during the date she and Appellant had "made out," and that he had consensually kissed her when he dropped her off at a friend's house after the date. However, Appellant and SP did not continue to date thereafter and had no further romantic relationship.

Trial defense counsel did not provide pretrial notice of intent to introduce evidence of the date at trial. During her direct examination, SP testified that prior to the sexual assault she viewed Appellant as "a kind gentleman," "brotherly[,] and like a close, close family friend," but she "just never found him [sexually] attractive." During her cross-examination, SP testified that, as of the date of the sexual assault, she and Appellant "were not romantic in any way" and he was "not someone [she] was attracted to or wanted to kiss." Civilian trial defense counsel did not attempt to raise the subject of SP's date with Appellant during the cross-examination of SP.

---

[8] The parties' filings with respect to this issue are sealed. We refer to sealed portions of the record only to the extent necessary for our analysis.

**2. Law**

The Sixth Amendment[9] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id*. (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475. With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. Mil. R. Evid. 412(b)(2) provides, *inter alia*, evidence of specific instances of an alleged victim's sexual behavior with the accused is admissible if offered by the defense to prove consent. Mil. R. Evid. 412(b)(3) provides evidence of an alleged victim's other sexual behavior or sexual predisposition is also admissible if its exclusion "would violate the accused's constitutional

---

[9] U.S. CONST. amend. VI.

rights." A party intending to introduce Mil. R. Evid. 412 evidence must submit a motion at least five days prior to entry of pleas. Mil. R. Evid. 412(c)(1)(A).

### 3. Analysis

Appellant contends trial defense counsel were ineffective for failing to confront SP with evidence of her prior sexual behavior with Appellant. He argues this evidence increased greatly in significance after SP testified she had no romantic interest in Appellant and no desire to kiss him, and trial defense counsel should have prepared by filing a pretrial motion and notice as required by Mil. R. Evid. 412(c)(1). Appellant contends the court members' mixed findings indicate they harbored some doubt about SP's testimony, and that in a close case such evidence could have further tipped the scales in Appellant's favor.

This court ordered and received declarations from Appellant's civilian trial defense counsel, Mr. C, and two military trial defense counsel, Captain (Capt) A and Capt M. Mr. C, who was the lead trial defense counsel and conducted the cross-examination of SP, explained that not seeking to confront SP with evidence of her prior date with Appellant was an intentional strategic and tactical choice. Mr. C explained the Defense assessed the date had low probative value as to whether SP was attracted to Appellant and consented to sexual intercourse approximately seven months later. To the contrary, the fact that there was only one date followed by seven months of inactivity could be interpreted as evidence of SP's lack of sexual interest in Appellant. In addition, trial defense counsel anticipated SP would be a canny adverse witness who would likely portray her date with Appellant in a negative light on cross-examination, potentially further damaging the Defense's case. Mr. C explained how he intended to use other methods—such as the perceived improbability of certain aspects of SP's account, certain allegedly inconsistent statements SP made about the sexual assault, and her motives to fabricate the allegation—to undermine SP's credibility, such that attempting to confront SP about the date was unnecessary, risky, and of dubious probative value. The declarations of Capt A and Capt M are generally consistent with Mr. C's declaration, and fully supportive of the decision not to confront SP regarding her date with Appellant.

We find Appellant has failed to demonstrate deficient performance by trial defense counsel. Trial defense counsel have provided sufficient explanations for the decision not to seek to introduce evidence of SP's and Appellant's prior date. Although including such evidence in a motion and providing notice as required by Mil. R. Evid. 412(c)(1)(A) might have been prudent in case of a change in defense strategy, we are not persuaded trial defense counsel's

performance fell below the level of advocacy expected of lawyers. The early determination that the date was not going to be part of the defense strategy and decision to focus their efforts elsewhere was not an unreasonable choice. Accordingly, we conclude Appellant did not suffer a violation of his Sixth Amendment rights.

## D. Sexual Assault Forensic Examination Photographs

### 1. Additional Background

At trial, the Government sought to introduce as a prosecution exhibit three photographs the SANE took during her examination of SP. According to the SANE's testimony, the photos depicted the presence of a "thick white and clear fluid" inside SP's vaginal vault. The Defense objected to the admission of the photographs based on Mil. R. Evid. 403. During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session to address the objection, trial defense counsel began by noting "the [D]efense has conceded the [sexual act] occurred and . . . there was semen present upon forensic examination." Trial defense counsel essentially argued the photographs were cumulative with the SANE's testimony and information in the SANE's report of the examination—admitted as a separate prosecution exhibit—and that the graphic and "potentially perceived as grotesque" nature of the images could inflame or disturb the court members, such that the probative value was substantially outweighed by the danger of unfair prejudice to Appellant.

After hearing from trial counsel and asking some clarifying questions of the SANE, the military judge overruled the objection with respect to all three photographs in an oral ruling he explained on the record. The military judge explained the photographs were "particularly relevant and probative in proving that there was penetration by a penis, which is a critical element for the [G]overnment to be able to carry their burden of proof beyond a reasonable doubt." The military judge noted the Defense was not "particularly challenging that element," but observed that his ruling could change if the Defense observed a "deficit of proof with respect to penetration." The military judge further found the probative value was not outweighed, much less substantially outweighed, by any countervailing concerns. He was not persuaded any "squeamishness" on the part of the court members would interfere with their ability to evaluate the evidence. He found the photographs were not cumulative with the written report, because it was "different for the members to see that this is in there" and "allow[ed] them to look and see what was seen by the person making that notation, and thereby draw their own conclusions about the meaning and effect of this evidence on their deliberations." The military judge further explained he had no concerns with confusion of the issues,

misleading the court members, waste of time, or undue delay, and he found the images did not "make the accused out to be a worse or a better person."

Accordingly, the photographs were admitted as Prosecution Exhibit 16 and published to the court members.[10] Trial counsel displayed the images during a portion of the Government's closing argument.

### 2. Law

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citation omitted), *cert. denied*, 141 S. Ct. 2864 (2021). "A military judge abuses his discretion when his findings of fact are clearly erroneous, [his] decision is influenced by an erroneous view of the law, or [his] decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citation omitted).

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Relevant evidence is generally admissible, unless otherwise provided by the Military Rules of Evidence or other law. Mil. R. Evid. 402. Relevant evidence that is otherwise admissible may be excluded if the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the court members, undue delay, waste of time, cumulativeness, or other countervailing considerations. Mil. R. Evid. 403. "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)). "For [a] ruling to be an abuse of discretion, it must be 'more than a mere difference of opinion'; rather, it must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)).

### 3. Analysis

Appellant contends the military judge abused his discretion by admitting Prosecution Exhibit 16. He emphasizes the Government introduced the photographs after SP had testified, and that the Defense was not contesting penetration. Appellant contends the "probative value of the evidence disappears

---

[10] The military judge ordered the photographs sealed in the record of trial due to their sensitive nature.

when it addresses an uncontested issue," and he asserts "[t]here was zero reason remaining to admit the photographs, other than to provoke a reaction from the members" which created a danger of unfair prejudice due to their "graphic and gripping nature."

We do not find the military judge abused his discretion. We agree with the military judge the photographs were relevant in that they had a clear tendency to prove the required element of penetration. The Government's proof was constructed from evidence introduced in the court-martial, not by the Defense's decision not to challenge particular elements of the offense at a given point in time. *See Matthews v. United States*, 485 U.S. 58, 64–65 (1988) ("A simple plea of not guilty puts the prosecution to its proof as to all elements of the crime charged . . . ." (citations omitted)). We further conclude the military judge's determination that the probative value was not substantially outweighed by countervailing concerns was not clearly unreasonable or erroneous. Although graphic, the images were not so shocking as to inflame or distract the court members. They essentially illustrated and amplified aspects of what the SANE described in her testimony and examination report. Although the Government likely could have proved penetration without the photographs, they provided additional information to the court members and were not merely cumulative. Other potential countervailing considerations such as unnecessary delay or confusion of the issues were negligible or nonexistent. Accordingly, we conclude Appellant's assignment of error is without merit.

## E. Mil. R. Evid. 404(b) and Mil. R. Evid. 413

### 1. Additional Background

Before trial, the Government provided the Defense with notice that it may offer evidence of Appellant's uncharged acts with two other women, MW and JS, pursuant to Mil. R. Evid. 413 and Mil. R. Evid. 404(b). With respect to MW, the Government's notice stated that Appellant penetrated MW's vulva with his penis without her consent.[11] The Government intended to use this evidence as evidence of an "other sexual offense" pursuant to Mil. R. Evid. 413, or, in the alternative, "as proof of [Appellant's] plan and intent to commit" a charged sexual assault pursuant to Mil. R. Evid. 404(b).[12] With regard to JS, the

---

[11] The Government's notice erroneously indicated this incident occurred in January or February 2018; the evidence showed the incident actually occurred in February 2019. This discrepancy in the Government's notice is not material to our analysis on appeal.

[12] Appellant was ultimately acquitted of this charged sexual assault, which involved an alleged victim other than SP or NA.

Government's notice stated in the fall of 2017 or spring of 2018 Appellant, "while drinking alcohol, put his hands on [JS's] hips as she walked by him, pulled her between his legs, and said 'make me feel like a man' or words to that effect." The Government intended to use this evidence as "proof of [Appellant's] motive and intent to commit" the three charged sexual assaults against SP.

The Defense moved to exclude the noticed evidence regarding MW and JS. The Government opposed the defense motions. Over the course of two motion hearings the military judge received evidence and heard arguments on the noticed evidence regarding MW and JS.

The evidence provided to the military judge regarding Appellant's alleged uncharged sexual assault against MW consisted of a written summary of MW's interview by AFOSI agents. In pertinent part, MW told the agents she met Appellant when they both attended USAFA and she had consensual sex with him approximately three times in October and November 2018. In January or February 2019, MW received a text message from Appellant who stated he was drunk and "not ok." MW was aware the date was close to the anniversary of the death of Appellant's prior girlfriend, and she was worried about his mental health. MW agreed to meet Appellant and they talked for a time in a dormitory stairwell. Appellant asked MW to stay with him that night; MW hesitated but agreed after Appellant stated there would be "No sex, just sleep." As MW and Appellant lay next to each other on the floor of Appellant's room, Appellant suggested MW remove her shirt, which MW agreed to do because the room was warm. Appellant then attempted to pull down MW's pants. MW told Appellant "No," and he stopped temporarily, only to try again after some period of time. This pattern occurred several times until the final time, when Appellant did not stop after MW said "No." Appellant removed MW's pants and penetrated her vagina with his penis until he ejaculated. MW remained until the following morning, when she got dressed, hugged Appellant goodbye, and returned to her room where she took a shower. MW did not seek medical attention and did not initially report the incident, although over time she told several other cadets and members of her family about the incident.

The evidence provided to the military judge regarding the incident with JS came from a written summary of an AFOSI interview of JS, as well as JS's testimony at a motion hearing. JS met Appellant at USAFA and initially considered him a friend. She described an incident in the fall semester of 2017 or spring semester of 2018 when she was in the dormitory room of another male cadet, CW, watching CW and Appellant play video games. Appellant had been drinking alcohol. According to JS, as she walked past Appellant, he put his hands on her hips or waist and pulled her toward him between his legs.

17

Appellant said something to JS which included the phrase, "make me feel like a man." JS pushed herself away from Appellant. CW told Appellant it was time for Appellant to leave, and CW escorted Appellant back to Appellant's own room. According to JS, she and Appellant later had a falling out in December 2018 and were no longer friends after that point.

The military judge issued a written ruling denying the defense motions to exclude evidence involving MW and JS.[13] The military judge further held that evidence of Appellant's alleged sexual assault against MW was admissible under Mil. R. Evid. 413 with respect to the charged sexual assault against SP by penetrating her vulva with his penis (Specification 1 of Charge II).[14] The military judge held that evidence of the incident involving JS was admissible under Mil. R. Evid. 404(b) as circumstantial evidence of Appellant's motive and intent regarding the charged sexual assaults against SP (Specifications 1, 2, and 3 of Charge II).[15]

At trial, MW and JS both testified in a manner generally consistent with their pretrial statements. The trial judge provided the court members with limiting instructions regarding the testimony; Appellant does not specifically challenge these instructions on appeal.

### 2. Law

We review a military judge's decisions to admit evidence pursuant to Mil. R. Evid. 413 and Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted); *United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016) (citation omitted). "An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law." *United States v. Hernandez*, 81 M.J. 432, 437 (C.A.A.F. 2021) (citation omitted). "The abuse of discretion

---

[13] The military judge's ruling also addressed evidence regarding a third uncharged incident; however, that evidence was ultimately not introduced at trial and is not pertinent to this appeal.

[14] The military judge held this evidence was also admissible as to charged sexual assaults involving two other alleged victims (Specifications 4 and 5 of Charge II). However, Specification 5 was withdrawn before trial and Specification 4 resulted in an acquittal, so this aspect of the military judge's ruling is not pertinent on appeal.

[15] The military judge held this evidence was also admissible as to Specification 4 of Charge II, which, as indicated *supra*, resulted in an acquittal and is not pertinent to this appeal.

standard is a strict one, calling for more than a mere difference of opinion." *McElhaney*, 54 M.J. at 130.

Mil. R. Evid. 413 provides that "[i]n a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. The evidence may be considered on any matter to which it is relevant." Mil. R. Evid. 413(a). "This includes using evidence of either a prior sexual assault conviction or uncharged sexual assaults to prove that an accused has a propensity to commit sexual assault." *Hills*, 75 M.J. at 354 (C.A.A.F. 2016) (citing *United States v. James*, 63 M.J. 217, 220–22 (C.A.A.F. 2006)). However, the prosecution cannot "use charged sexual misconduct to prove propensity to commit other charged sexual misconduct under [Mil. R. Evid.] 413." *United States v. Upshaw*, 81 M.J. 71, 74 (C.A.A.F. 2021) (citing *Hills*, 75 M.J. at 352), *recon. granted by* 81 M.J. 313 (C.A.A.F. 2021). For purposes of Mil. R. Evid. 413, a "sexual offense" includes, *inter alia*, "any conduct prohibited by Article 120[, UCMJ]." Mil. R. Evid. 413(d)(1).

In *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000), the United States Court of Appeals for the Armed Forces (CAAF) explained that military judges are required to make three threshold findings before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another offense of sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and Mil. R. Evid. 402. Additionally, the military judge must apply the balancing test of Mil. R. Evid. 403 to determine whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other countervailing considerations. *Id*. Further, the CAAF set forth a non-exclusive list of factors to be considered under Mil. R. Evid. 403 in the context of Mil. R. Evid. 413 evidence: the strength of the proof of the prior act of sexual assault; the probative weight of the evidence; the potential for less prejudicial evidence; distraction of the factfinder; the time needed for proof of the prior conduct; the temporal proximity of the prior conduct to the charged offense(s); the frequency of the acts; the presence or absence of intervening circumstances between the prior acts and charged offenses; and the relationship between the parties involved. *Id.* "[I]nherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission." *United States v. Berry*, 61 M.J. 91, 94–95 (C.A.A.F. 2005) (citing *Wright*, 53 M.J. at 482–83).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a

particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving motive, intent, or the absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that [the] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Hyppolite*, 79 M.J. at 162 (omissions in original) (quoting *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989)). "When considering whether uncharged misconduct constitutes admissible evidence of intent under [Mil. R. Evid.] 404(b), we consider 'whether Appellant's state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offenses.'" *United States v. Hays*, 62 M.J. 158, 164 (C.A.A.F. 2005) (quoting *United States v. McDonald*, 659 M.J. 426, 430 (C.A.A.F. 2004)). Mil. R. Evid. 404(b) "is a rule 'of inclusion rather than exclusion'" that "permits admission of relevant evidence of other crimes or acts unless the evidence 'tends to prove only criminal disposition.'" *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000) (quoting *United States v. Simon*, 767 F.2d 524, 526 (8th Cir. 1985), *cert. denied*, 474 U.S. 1013 (1985)).

"Absent evidence to the contrary, this Court may presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

Whether an error is harmless is a question of law we review de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

**3. Analysis**

Appellant contends the military judge abused his discretion by permitting the testimony of MW and JS under Mil. R. Evid. 413 and Mil. R. Evid. 404(b), respectively. We consider each witness in turn.

**a. MW**

Appellant concedes the threshold requirements for admissibility under Mil. R. Evid. 413 were met: that Appellant was charged with a sexual assault against SP; that MW's testimony provided evidence Appellant committed another sexual assault; and that, if believed, the evidence was relevant. *See Wright*, 53 M.J. at 482. However, Appellant contends the military judge erred in applying the *Wright* factors to his Mil. R. Evid. 403 analysis. We disagree.

The military judge's ruling correctly recited the applicable law, including the nine factors the CAAF identified in *Wright*, and specifically stated the military judge had considered them in applying Mil. R. Evid. 403. The fact that the military judge relied on some factors to a greater degree than others, or analyzed some factors—notably the strength of the evidence and temporal proximity of the uncharged conduct to the charged offense—in greater detail, does not create any implication the military judge failed to consider or misapplied the other factors. Notably, the military judge found the strength of the evidence was heightened by the fact it was supported by MW's sworn statement to the AFOSI and by the absence of any apparent motive for MW to fabricate the allegation.

Appellant contends two factors "compel[led] exclusion of the evidence," specifically the "weakness" of the evidence and the relationship between MW and Appellant. Appellant's analysis does not clearly distinguish between these factors, but he cites such matters as the prior consensual sexual relationship between MW and Appellant; MW's willingness to remove her shirt which "makes little sense" if she did not intend "anything sexual;" MW's limited memory of the details of the sexual assault; and the fact that MW hugged Appellant goodbye the following morning.[16] However, these points are not overtly inconsistent with MW's sworn statement that Appellant penetrated her vulva with his

---

[16] Appellant's brief before this court repeatedly cites to MW's trial testimony rather than the evidence which was before the motions judge—the written summary of her AFOSI interview. Of course, it is the latter rather than the former that is relevant to determining whether the military judge abused his discretion in his pretrial ruling. However, as noted above, MW's testimony was substantially similar to her AFOSI interview on the points Appellant cites, so this discrepancy has little effect on our analysis.

penis without her consent, and the finder of fact could reasonably credit her testimony if and when the Government offered it. Moreover, Appellant fails to explain how particular countervailing concerns "substantially outweighed" the probative value of MW's testimony, whereas the military judge explicitly addressed and discounted the potential dangers of unfair prejudice, confusion, or waste of time.

Having ourselves considered the Mil. R. Evid. 403 balancing test and the *Wright* factors specifically, and in light of the general presumption in favor of admitting Mil. R. Evid. 413 evidence, we find the military judge did not abuse his discretion in allowing MW's testimony pursuant to Mil. R. Evid. 413.

### b. JS

We find the military judge's decision to permit JS's testimony pursuant to Mil. R. Evid. 404(b) was not "arbitrary, fanciful, clearly unreasonable or clearly erroneous." *Collier*, 67 M.J. at 353 (citation omitted).

The military judge first articulated a detailed review of applicable precedent regarding evidence of motive and intent under Mil. R. Evid. 404(b). He then applied the first prong of the *Reynolds* test and found a reasonable finder of fact could find by a preponderance that Appellant put his hands on JS's hips, pulled her between his legs, and told her "make me feel like a man," or words to that effect. Second, the military judge found the applicable "fact of consequence" was Appellant's "motive" and "intent" as to the charged specifications "involving alleged non-consensual touchings following [Appellant's] consumption of alcohol," including the alleged sexual assaults against SP. Third, in weighing the probative value against the danger of unfair prejudice, the military judge concluded:

> the probative value is buttressed by the similarity of the charged versus uncharged misconduct in terms of his enhanced motive and intent to initiate unwanted sexual touchings once he becomes uninhibited with alcohol consumption. Given the significance of the probative value, it is not substantially outweighed by the dangers of unfair prejudice (a propensity inference) given the prompt limiting instruction the Court will provide both at the time of the testimony and during final findings instructions.

Appellant concedes the military judge "exhaustively surveyed the relevant law," but nevertheless asserts he "reached the wrong conclusion." With regard to the second prong of the *Reynolds* test, Appellant contends evidence of his behavior with JS—grabbing her hips in front of another cadet—was not probative of his intent with respect to the charged sexual assaults of SP because the

"situations are not meaningfully similar." *See Hays*, 62 M.J. at 164. Similarly, Appellant argues the incident with JS is not probative of Appellant's motive because Appellant's "seemingly joking" behavior with JS did not evince the same motive as the charged sexual assault. *See United States v. Watkins*, 21 M.J. 224, 227 (C.M.A. 1986). Furthermore, Appellant questions whether "intent" or "motive" were meaningfully in issue—given the "overtly sexual" nature of the charged offenses with SP, Appellant's evident motive would have been to engage in sexual intercourse with SP. *See United States v. Morrison*, 52 M.J. 117, 123 (C.A.A.F. 1999) ("The charged acts were so overtly sexual that motive and intent were not in issue[; t]hus, the probative value of the evidence was minimal on the issues of motive and intent."). Furthermore, given the "tenuous" probative value, Appellant contends JS's testimony fails the third *Reynolds* prong because the court members were likely to draw an impermissible "bald propensity inference," and because of the risk the court members would not be able to correctly compartmentalize their consideration of the non-propensity Mil. R. Evid. 404(b) evidence from the Mil. R. Evid. 413 evidence relating to MW, which was available to prove propensity.

In our view, the key to correctly assessing the probative value of JS's testimony is to determine the nature of Appellant's motive and intent that was at issue. If the Government were seeking simply to establish that Appellant's motive and intent with respect to SP was to gratify his sexual desires, the probative value of JS's testimony might indeed be low.[17] *See Morrison*, 52 M.J. at 123. However, the military judge's ruling indicates he viewed the relevant motive and intent in a different light. He described the issue of "intent" in this case as "highly contested." What was highly contested was not whether Appellant derived sexual gratification from sexually assaulting SP, but whether SP consented to the sexual acts, or Appellant reasonably believed she consented. If the relevant intent is understood to relate to Appellant's intent *with respect to whether SP consented—i.e.*, his disregard for the absence of consent—then the relevance of JS's testimony increases sufficiently to justify its admission. In common with the circumstances of the charged sexual assault of SP, as well

---

[17] We do not suggest that as a general matter the probative value of demonstrating an accused acted with a lustful motive or intent is necessarily insufficient to warrant admission of uncharged acts under Mil. R. Evid. 404(b). *Cf. United States v. Tanksley*, 54 M.J. 169, 174 (C.A.A.F. 2000) ("This Court has repeatedly concluded that a pattern of lustful intent, established in one set of specifications, could be used by factfinders as proof of lustful intent in a different set of specifications." (Citing Mil. R. Evid. 404(b)) (additional citations omitted), *overruled in part on other grounds*, *United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003)). Such determinations necessarily depend on the circumstances of each individual case.

as the Mil. R. Evid. 413 evidence from MW, JS testified that Appellant, after consuming alcohol, touched JS without her consent in a sexually charged and provocative manner. Although the Defense was free to argue to the court members that Appellant was merely "joking" with JS and the situations were not "meaningfully similar," the military judge and court members were not bound to accept that interpretation. They could reasonably view the situations as similar in a manner illustrative of Appellant's intent regarding SP's consent, or lack thereof.

It is true that the admission of both Mil. R. Evid. 413 evidence and Mil. R. Evid. 404(b) evidence in Appellant's case required the court members to compartmentalize and use the evidence in different ways. However, as the motions judge anticipated, the trial judge provided the court members with limiting instructions with respect to the testimony of MW and JS, the correctness of which Appellant has not challenged on appeal. *Cf. Taylor*, 53 M.J. at 198 (stating appellate courts may presume court members follow instructions absent evidence to the contrary). In light of the proper court member instructions; our recognition that Mil. R. Evid. 404(b) is a rule of inclusion, *see Browning*, 54 M.J. at 6; and the applicable "deferential" standard of review, *see Hyppolite*, 79 M.J. at 166; we are not persuaded the military judge abused his discretion.

Assuming *arguendo* the military judge did abuse his discretion by admitting JS's testimony, applying the four *Kerr* factors, we are not persuaded the error had a substantial influence of the findings. *See Bowen*, 76 M.J. at 87. As an initial matter, we note again the military judge admitted JS's testimony only with regard to the alleged sexual assaults against SP and instructed the court members accordingly. The Government's case with respect to Appellant's conviction for sexual assault of SP was strong. The sexual act was essentially undisputed, and SP's near-immediate reporting, consistent statement to the SANE, and emotional reaction observed by SP's friends and the SANE tended to corroborate her testimony that she did not consent. In contrast, the Defense's case was relatively weak, relying largely on alleged inconsistencies and improbabilities in SP's account the court members could reasonably discount as insignificant. In addition, despite Appellant's contentions to the contrary, the Defense failed to identify a persuasive motive for SP to fabricate false allegations against Appellant.

Most significantly, the materiality of JS's testimony was low in the context of the entire court-martial. JS's testimony described a brief, spontaneous incident with Appellant in a dorm room in front of another cadet, not involving intimate contact, which Appellant himself described as "seemingly joking." In contrast, SP described a much more serious allegation—sexual assault

involving penile penetration of her vagina. Moreover, the court members also received MW's Mil. R. Evid. 413 testimony of an uncharged sexual assault by Appellant, significantly more similar to the sexual assault of SP than the JS incident. Furthermore, they were specifically instructed they could use MW's testimony as evidence of Appellant's propensity to commit the offenses alleged by SP. In addition, the court members' mixed findings suggest they carefully parsed the evidence supporting each specification rather than succumbing to sweeping conclusions regarding Appellant's tendency to commit the charged offenses. The quality of the evidence was solid, in that JS provided a clear account of the incident which trial defense counsel did not significantly impeach during a brief cross-examination. Nevertheless, based on the relative dissimilarity and far lower severity of JS's testimony compared to the sexual assault of SP, and in light of the totality of the evidence in the case, we are not persuaded JS's testimony had a substantial effect on the findings.

## F. Sentencing Evidence

### 1. Additional Background

The Government called SP's mother and stepfather, PT and JT, to testify during presentencing proceedings. During an Article 39(a), UCMJ, session, the Defense objected to multiple aspects of their anticipated testimony, including *inter alia* how Appellant's offenses with SP affected their views of the Air Force and USAFA. Civilian trial defense counsel characterized such testimony as "treating the Air Force or [USAFA] itself as a victim," which he argued was not proper aggravation evidence under R.C.M. 1001(b)(4) and would additionally fail the Mil. R. Evid. 403 balancing test. Trial counsel responded by disclaiming such evidence was victim impact, but contended it was proper evidence of impact on the unit, specifically USAFA.

In an oral ruling, the military judge overruled the objection, finding the proposed testimony "m[e]t the requirements under R.C.M. 1001(b)(4)." He further characterized "a decreased or a lesser impression of the military or [USAFA] because of the accused's crimes" as "very typical evidence." He further observed the Defense could still potentially object depending on how such testimony was elicited before the court members. The military judge did not conduct a specific Mil. R. Evid. 403 analysis on the record with regard to such testimony.

During PT's presentencing testimony, trial counsel asked her how she viewed the military and USAFA before she learned of Appellant's offenses with SP. PT testified that she previously "loved" USAFA and once thought her

deceased son might have attended it one day.[18] When trial counsel asked if Appellant's offenses had affected her views, PT said they had. She explained,

> [Y]ou read things in the paper about the sexual assaults in the Air Force and how it's prevalent. But once it's home, once it affects your family, once I felt it and thought -- and I thought someone was honest and believable. He is a reflection on the Air Force. And now I -- we just want to get out of here. We don't want to be a part of it. It's a black mark.

Trial defense counsel did not object during PT's presentencing testimony. Trial counsel called JT to testify during presentencing but did not ask him about his views on the military or USAFA.

### 2. Law

We review a military judge's decision to admit sentencing evidence for an abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *Manns*, 54 M.J. at 166).

> A military judge abuses his or her discretion when: (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citations omitted).

R.C.M. 1001(b)(4) provides in part:

> Trial counsel may present evidence as to *any* aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, *but is not limited to*, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.

---

[18] Witnesses previously testified that PT's 15-year-old son, SP's brother, had died years earlier in an airplane crash.

(Emphasis added). "There are two primary limitations on the admission of aggravation evidence" pursuant to R.C.M. 1001(b)(4): such evidence must directly relate to the offenses of which the accused has been found guilty, and it must pass the balancing test of Mil. R. Evid. 403. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (citations omitted). Appellate courts "give[ ] military judges less deference if they fail to articulate their [Mil. R. Evid. 403] balancing analysis on the record, and no deference if they fail to conduct the [Mil. R. Evid.] 403 balancing." *Manns*, 54 M.J. at 166 (citation omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion by permitting PT's testimony regarding how her views of the Air Force and USAFA changed as a result of Appellant's offenses, echoing civilian trial defense counsel that it was "akin to treating the institution as though it were a victim." Appellant further contends the military judge failed to consider the court-martial was taking place at USAFA before a panel of officers who worked there, which heightened the risk of unfair prejudice toward Appellant from evidence of diminished esteem for the institution.

We do not find the military judge abused his discretion. His analysis of this aspect of the defense objection to the anticipated testimony was very brief and not particularly edifying. Moreover, he did not articulate any Mil. R. Evid. 403 analysis of this aspect of the testimony. Nevertheless, we find no indication he relied on facts that were unsupported by the record, applied incorrect legal principles, or failed to consider important facts, and we do not find his application of the law to the facts was clearly unreasonable. R.C.M. 1001(b)(4) does not limit evidence in aggravation to "financial, social, psychological, and medical impact" on a victim and "significant adverse impact on the mission, discipline, or efficiency of the command." R.C.M. 1001(b)(4) broadly authorizes "evidence as to *any* aggravating circumstances" so long as they directly relate to or result from the offenses of which the accused was convicted, subject also to Mil. R. Evid. 403. (Emphasis added). "Aggravation" may be defined as "[a]ny circumstance attending the commission of a crime or tort which increases its guilt or enormity *or adds to its injurious consequences . . . ." Aggravation*, BLACK'S LAW DICTIONARY (6th ed. 1990) (emphasis added). PT's diminished esteem for and desire to associate with the Air Force and USAFA could reasonably be considered an injurious consequence, and it was plainly directly related

to and resulted from Appellant's offenses with SP.[19] Moreover, we do not find the danger of unfair prejudice substantially outweighed the probative value of the evidence. PT's testimony regarding the Air Force and USAFA was unsurprising given the nature of the offenses and all the evidence that preceded it; nor was it so inflammatory as to inappropriately influence or distract the court members from their duty as fair and impartial arbiters of Appellant's sentence. Accordingly, we find no error.

## G. Trial Counsel's Sentencing Argument

### 1. Additional Background

Trial counsel's sentencing argument included the following:

> You should also consider the public image of the Air Force and its cadets. The word is out there through [SP], through [NA], through [JT and PT], that an Air Force Academy Cadet sexually abused a child, sexually assaulted their daughter. It tarnishes the reputation of this institution in its ability to accomplish its mission, of attracting leaders of character and training them to go out into the Air Force and lead. We don't train them to sexually assault civilians outside of base. We don't train them to sexually assault anybody. And yet, that's exactly what [Appellant] did and that's exactly the image that he put out there for this Air Force Academy.

> Your sentence that you ladies and gentlemen choose in this case is going to send a message. It's inevitable. It's going to send a message to [Appellant] of whether his conduct will be tolerated in our Air Force. It's going to send a message to [Appellant] of how serious, how seriously we take sexual assault, and sexual abuse of a child, and providing alcohol to minors [to] facilitate it. It will deter him from committing future crimes. A sufficient punishment. But it's not just [Appellant] who is going to get a message. The military gets a message from the sentence that you all will decide. What you decide will send a message to the Air Force Academy, to all of the cadets here, to bases on the front range, and to the Air Force as a whole that the Air Force takes

---

[19] Because trial counsel denied this testimony was offered as evidence of victim impact, we do not address whether such testimony would have been admissible specifically as "psychological" impact on PT in her status as a victim of the offenses. *See* R.C.M. 1001(b)(4).

sexual assault seriously. And any sexual misconduct of this na-
ture will be dealt with appropriately and sufficiently. It also
sends a message outside of the Air Force. It sends a message to
society because they need to see us taking sexual assault seri-
ously as well.

Trial defense counsel did not object to this argument.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and
where . . . no objection is made, we review for plain error." *United States v.
Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J.
393, 398 (C.A.A.F. 2018)). Under plain error review, the appellant bears the
burden to demonstrate error that is clear or obvious and results in material
prejudice to his substantial rights. *United States v. Knapp*, 73 M.J. 33, 36
(C.A.A.F. 2014) (citation omitted).

"[T]rial counsel may 'argue the evidence of record, as well as all reasonable
inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J.
477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237
(C.A.A.F. 2000)). "[I]t is not a 'fair inference' to argue that a member's duty
position aggravates the offense unless the evidence of record demonstrates
some reasonable linkage or manner in which the offense was facilitated by the
duty position or the duty position was somehow compromised by the offense."
*United States v. Bobby*, 61 M.J. 750, 755 (A.F. Ct. Crim. App. 2005) (citations
omitted). "A prosecutorial comment must be examined in light of its context
within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33
(C.A.A.F. 2005) (citation omitted).

Relief for improper argument will be granted only if the trial counsel's mis-
conduct "actually impacted on a substantial right of an accused (*i.e.*, resulted
in prejudice)." *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quot-
ing *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). We assess prejudice
by considering whether the trial counsel's comments were so damaging that
we cannot be confident the appellant was sentenced on the basis of the evidence
alone. *See Halpin*, 71 M.J. at 480. In assessing prejudice from improper argu-
ment, we balance three factors: (1) the severity of the misconduct; (2) the
measures, if any, adopted to cure the misconduct; and (3) the weight of the
evidence supporting the conviction or sentence, as applicable. *See id.* "[T]he
lack of a defense objection is 'some measure of the minimal impact of a prose-
cutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v.
Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999)).

### 3. Analysis

Appellant essentially contends trial counsel's sentencing argument was improper in three respects. First, Appellant contends that to the extent trial counsel was suggesting Appellant's conduct had an adverse impact on USAFA as evidence in aggravation under Mil. R. Evid. 1001(b)(4), such an argument was "utterly without foundation in the evidence." Second, Appellant contends that if trial counsel was arguing a more severe punishment was necessary to protect USAFA's reputation, such an argument was improperly based on an "external interest" affecting the court members rather than based on Appellant and the offenses. Third, Appellant contends trial counsel improperly suggested Appellant used his status as a USAFA cadet to commit the offenses, which was unsupported by the evidence and contrary to longstanding case law that an accused's position or status alone is not an aggravating circumstance or proper basis for increased punishment.

Because trial defense counsel did not object to the Government's sentencing argument, we review for plain error. We find no clear or obvious error on the grounds Appellant cites.

First, as explained above with respect to the military judge's ruling on PT's presentencing testimony, PT's testimony as to how Appellant's offenses affected her perception of the military and USAFA can reasonably be viewed as an aggravating circumstance, regardless of whether it measurably impacted the mission of USAFA or any other Air Force unit. PT's testimony supported trial counsel's argument in that at least one person's opinion of the Air Force and USAFA was "tarnished" by Appellant's offenses, and it was a reasonable inference that other members of the public could also learn of Appellant's offenses through JT, SP, and NA. Accordingly, we do not agree trial counsel's argument was "utterly without foundation" in this respect.

Second, we are not persuaded trial counsel's argument was "calculated" to improperly sway the court members to increase Appellant's punishment based on "an external interest," specifically "the reputation of the institution where all of the members were assigned." As described above, the negative effect of Appellant's offenses on the perception of USAFA could reasonably be viewed as proper aggravation evidence. Appellant compares his case to *Norwood*, 81 M.J. at 21, where trial counsel "pressured the members to consider how their fellow service-members would judge them and the sentence they adjudged instead of the evidence at hand." However, in the instant case trial counsel did not invite the court members to consider a similar "inflammatory hypothetical scenario" in which they would be personally judged for their decisions. *Id.*; *cf. United States v. Witt*, No. ACM 36785 (reh), 2021 CCA LEXIS 625, at *140–42

(A.F. Ct. Crim. App. 19 Nov. 2021) (unpub. op.), *aff'd*, 83 M.J. 282 (C.A.A.F. 2023) (applying *Norwood* and finding error). We are not persuaded the fact that the court members were, like Appellant, assigned to USAFA rendered trial counsel's reference to otherwise proper aggravation evidence a plain or obvious error.

Third, Appellant's argument that trial counsel "repeatedly claimed [Appellant] used his status to commit his offenses" is without foundation with respect to the Government's *sentencing* argument. Each of the cites Appellant offers in support of this contention is from circuit trial counsel's closing argument on findings.[20] Although we do not foreclose the possibility that in some cases trial counsel's argument on findings might improperly influence court member deliberations on sentencing, this is not such a case. In the cited portions of the findings argument, trial counsel generally suggested Appellant's status as a cadet put him in a position to get close to SP and her family, which put him in a position to commit the offenses; trial counsel did not argue Appellant deserves any greater punishment as a consequence. Accordingly, we are not persuaded by Appellant's argument that trial counsel improperly used Appellant's status as a cadet as a basis for increasing his sentence. Furthermore, assuming *arguendo* trial counsel's argument did have that effect, we do not find plain or obvious error. The evidence permits a reasonable inference that Appellant's status as a USAFA cadet did contribute to his ability to get close to SP's family and "facilitated" his offenses against NA and SP. *See Bobby*, 61 M.J. at 755.

**H. Sentence Severity**

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citation omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although the Courts of Criminal Appeals are empowered to "do justice[ ] with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203

---

[20] Trial defense counsel did not object to these portions of the Government's closing argument.

(C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

### 2. Analysis

Appellant contends his sentence to six years of confinement is inappropriately severe in light of the offenses, his "strong" sentencing case, and his "demonstrated strong rehabilitative potential." Appellant argues his conviction for dereliction of duty for providing alcohol to a minor (SP) is an offense typically appropriate for nonjudicial punishment. He downplays the severity of his sexual abuse of a child conviction, arguing NA was only three months away from 16 years old at the time and therefore "[t]his is not a true child predator case that would merit lengthy punishment." Appellant concedes the sexual assault on SP "is clearly the most serious offense," but argues it does not warrant six years in confinement. Appellant cites the sentencing testimony of his father and several letters attesting to his purported good character and rehabilitation potential. Appellant also cites his unsworn statement which portrayed the death of Appellant's girlfriend in 2018, before the offenses occurred, as influencing him to drink alcohol excessively and seek "physical intimacy to fill the void." Appellant further notes his unsworn statement included apologies to SP and NA, and descriptions of his efforts to "rejoin [his] church community, participate in a recovery group, and rebuild his relationships with his family" in the months preceding his court-martial.

We are not persuaded Appellant's sentence is inappropriately severe. Appellant committed serious sexual offenses against SP and NA. The court members could have sentenced Appellant to be confined for up to 45 years and 6 months. Both victims provided unsworn statements describing enduring negative effects from Appellant's offenses. SP's mother testified to, *inter alia*, serious negative emotional, social, and educational consequences SP had endured, and she and SP's stepfather testified to the substantial guilt they felt for failing to protect SP from Appellant. The court members were presented with the mitigating and extenuating circumstances Appellant cites on appeal, and presumably considered them in arriving at the sentence. Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we conclude Appellant's sentence is not inappropriately severe.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles

59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).[21] Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[21] In a footnote, Appellant's brief before this court notes two post-trial errors. First, trial defense counsel's memorandum to the convening authority waiving Appellant's opportunity to submit matters under R.C.M. 1106 stated the convening authority had no power to grant clemency, which was inaccurate in that the convening authority could have taken action with respect to the adjudged forfeitures. *See* R.C.M. 1109(b)(5)(C). In addition, it appears SP's memorandum for the convening authority submitted pursuant to R.C.M. 1106A was not timely provided to Appellant before the convening authority's decision on action, as required by R.C.M. 1106(d) and R.C.M. 1106A(c)(3). However, Appellant "does not assert prejudice" due to "the improbability of the convening authority taking beneficial action on forfeitures." In light of Appellant's disavowal of material prejudice and election not to request relief, we find these errors do not require corrective action.